UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                           No. 17-CR-0344 MCA

KYLE D. BECENTI,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court upon Defendant Kyle Becenti's (Defendant's) *Opposed Motion to Suppress All Evidence Arising from Blood Drawn Pursuant to 'Consent' Coerced by Threat of Criminal Sanctions* [Doc. 16]. The United States filed a *Response* on March 7, 2017 [Doc. 19], and Defendant filed a *Reply* on March 21, 2017. [Doc. 33] A hearing was held on April 17, 2017. [Tr. 4/17/17, Doc. 77] The Court has considered the evidence presented at hearing, the parties' submissions and the relevant law, and is otherwise fully informed. For the following reasons, the Court **GRANTS** Defendant's *Motion*.

    I.   Background

The following alleged facts are derived from Defendant's *Motion*. [Doc. 16] The Government did not contest Defendant's statement of the facts. [Doc. 19] Defendant drove up to the Gibson Boulevard entrance to Kirtland Air Force Base (AFB) around 8:30 a.m. on February 4, 2017. [Doc. 16, pg. 2] AFB personnel stopped him and asked for identification, as they did all people attempting to enter the base. [*Id.*] Defendant did

not have any identification, and he told the first officer to approach him that he was being followed by drivers with Texas license plates, that he was filled with demons, and that his thoughts were being intercepted by others' phone calls. [*Id*. pg. 3] Defendant also told AFB officers that he had smoked methamphetamine one or two days before. [*Id*.]

AFB officers ordered Defendant out of his car and conducted a variety of field sobriety tests (FSTs). [*Id*.] Defendant voluntarily performed the horizontal gaze nystagmus test (HGN), the walk-and-turn test, and the one-leg-stand test. [*Id*.] He allegedly "passed" the one-leg-stand test, "failed" the walk-and-turn test, and "failed" the HGN test. [*Id*.] AFB officers asked for Defendant's consent to search his vehicle, which he gave. [*Id*.] They did not find any contraband. [*Id*.] AFB officers then arrested Defendant for suspected DUI and transported him, handcuffed, to the Base Defense Operations Center. [*Id*.]

At the Base Defense Operations Center, AFB officers read the "Kirtland Installation Implied Consent Advisory," which states, "You have consented to chemical test of your breath, blood, and/or urine by driving a vehicle on Base" and that "if you refuse to be tested . . . the offense may be characterized as 'aggravated,' [] you may receive a greater sentence because you refused to be tested, and [] your refusal may be admitted as evidence in *any* subsequent civil or criminal proceeding." [*Id*. pg. 3-4; Doc. 16-1] Defendant took a breath-alcohol test on a "high-quality infrared spectroscopy (non-portable) machine," which measured his blood alcohol content (BAC) as 0.00%. [*Id*. pg. 4; Doc. 16-4, pg. 2]

AFB personnel informed Defendant of his rights under *Miranda v. Arizona* and conducted a "Drug Influence Evaluation." [Doc. 16, pg. 4; Doc. 16-5] The evaluator concluded that, in his opinion, "[Defendant] [wa]s under the influence of a CNS [s]timulant and [h]allucinogen and not able to operate a motor vehicle safely." [Doc. 16-5, pg. 2]

Defendant gave a written statement on a stock form. He wrote his initials in multiple places around the edges of the form, and began his statement with, "First of ALL THIS paper is FULL of symbols." [Doc. 16-6] After Defendant completed his statement, AFB personnel asked for consent to draw blood, which Defendant gave. [Doc. 16-5, pg. 2, ¶ 12; Doc. 16, pg. 5] No warrant was obtained for the blood draw. [Doc. 16, pg. 5] After the blood draw, Defendant was transported to Sandoval County Jail. [*Id.*] The results of the blood draw indicated the presence of two constituents of marijuana and methamphetamine. [Gov. Exh. 7]

## II. Discussion

Defendant seeks to suppress the results of the blood draw on the ground that there was no warrant for the blood draw and no exception to the warrant requirement applied. He argues that any consent he gave for the blood draw was coerced by the AFB personnel threatening him with sanctions for refusal, and that the totality of the circumstances indicates that he did not otherwise consent. [Doc. 16, pg. 5] Defendant relies heavily on a recent case decided by the United States Supreme Court: *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016). To the extent that the Government argues that exigent circumstances justified the blood draw, Defendant disagrees. [Doc. 33, pg. 6-8]

The Government argues that *Birchfield* is inapposite here because Defendant did not refuse the test and his sentence was not aggravated. [Doc. 19, pg. 2] It also argues that suppression in these circumstances "would amount to the government being unable to prosecute anyone who consents to a blood draw for the presence of drugs" and force law enforcement to obtain a warrant, a "burden [that would] arguably be too great." [Doc. 19, pg. 2] Finally, the Government maintains that the totality of the circumstances shows that Defendant gave valid consent for the blood draw, [Doc. 19, pg. 3-4] or that there were exigent circumstances prompting the blood draw. [Doc. 19, pg. 4]

The Fourth Amendment provides:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment applies to blood draws, which are "an invasion of bodily integrity implicat[ing] an individual's most personal and deep-rooted expectations of privacy." *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) (internal quotation marks and citation omitted); *Birchfield*, 136 S. Ct. at 2173 (stating that "the taking of a blood sample or the administration of a breath test is a search"). Thus, a blood draw conducted without a warrant is unreasonable unless a recognized exception to the warrant requirement applies. *McNeely,* 133 S. Ct. at 1558 (stating that "a warrantless search of the person is reasonable only if it falls within a recognized exception"). A warrant is not required where 1) the defendant consents to the blood draw or 2) there are exigent circumstances justifying the search. *Birchfield*, 136 S. Ct. at 2173 (exigent

circumstances), 2185 (consent). The Government bears the burden of demonstrating that an exception applies. *United States v. Jeffers*, 342 U.S. 48, 51 (1951) (stating that "the burden is on those seeking the exemption [from the warrant requirement] to show the need for it").

### *Birchfield v. North Dakota*

Defendant relies on *Birchfield* for the proposition that "threatening a suspect with criminal sanctions for refusing a warrantless blood test renders any subsequent 'consent' to that test an involuntary submission to a claim of lawful authority," *i.e.*, invalid. [Doc. 16, pg. 5] *See Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1233 (10th Cir. 2001) (stating that "an individual's mere acquiescence to a claim of lawful authority is not, by itself, enough to show voluntary consent" and that "voluntary consent cannot be based on a misrepresentation of lawful authority" (internal quotation marks and citation omitted)). In *Birchfield*, the United States Supreme Court considered whether "laws that . . . make it a crime for a motorist to refuse to be tested after being lawfully arrested for driving while impaired . . . violate the Fourth Amendment's prohibition against unreasonable searches." 136 S. Ct. at 2166-67. Three different cases were consolidated. In the first, the defendant Birchfield was convicted for refusing a blood test under North Dakota's implied consent law. In the second, the defendant Bernard was convicted for refusing a warrantless breath test. Finally, in the third, the defendant Beyland acquiesced to a blood test after being informed that the law required his submission. *Id*. at 2186. After concluding that "a breath test, but not a blood test, may be administered as a search incident to arrest [without a warrant] for drunk driving," the court held that "[m]otorists

cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Id*. at 2185-86. Thus, the Court reversed the conviction of Birchfield, who had refused a blood test and been prosecuted for it. *Id*. at 2186. It affirmed the conviction of Bernard on the ground that the breath test was a proper search incident to arrest that did not require a warrant. *Id*.

More germane here, it remanded the matter of Beyland, who submitted to a blood test after being advised that the law required his submission, for "reevaluat[ion of] Beyland's consent given the partial inaccuracy of the officer's advisory." *Id*. Importantly, it noted that "[i]f the court on remand finds that Beyland did not voluntarily consent, it will have to address whether the evidence obtained in the search must be suppressed when the search was carried out pursuant to a state statute . . . ." *Id. at* 2186, n. 9.

Thus, the *Birchfield* holding pertaining to the Beyland fact pattern indicates that consent for a blood draw that is given in response to a threat of punishment, even under an implied consent law, is invalid because it is coerced. [Doc. 16, pg. 9] Applying that holding here, Defendant cannot be deemed to have consented to the blood draw on the basis of submission to a threat of prosecution. The Government agreed with this proposition at the hearing. [Tr. 4/17/17, pg. 80:5-9 ("THE COURT: You would agree that any consent to a blood draw given in response to a threat of criminal sanction is invalid under *Birchfield*? GOVERNMENT: I think if that's the only reason that they are consenting, yes.")]

The Court notes that the Kirtland Implied Consent Advisory references the federal implied consent act, 18 U.S.C. § 3118 (the Act). [Doc. 16-1] This Act provides that the penalty for refusing a blood test is

> deni[al of] the privilege of operating a motor vehicle upon the special maritime and territorial jurisdiction of the United States during the period of a year commencing on the date of arrest upon which such test or tests was refused, and such refusal may be admitted into evidence in any case arising from such person's driving while under the influence of a drug or alcohol in such jurisdiction.

This Act does not provide for criminal penalties. *See United States v. Love*, 141 F.R.D. 315, 319 (D. Colo. 1992) ("This section, as well as the others in this part of the United States Code, deals with procedural matters dealing with evidence. The section provides no criminal penalty for failing to abide by it. The loss of driving privileges within the military reservation is an administrative matter, not a function for court prosecution."). In *Birchfield*, the Court stated that "[o]ur prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply" and that "nothing [it said in *Birchfield*] should be read to cast doubt on them." *Birchfield*, 136 S. Ct. at 2185.

The New Mexico Implied Consent Act also provides for license revocation upon refusal of a blood test. NMSA 1978, § 66-8-111 (2005) ("The department, upon receipt of a statement . . . from a law enforcement officer stating the officer's reasonable grounds to believe the arrested person had been driving a motor vehicle within this state while under the influence of intoxicating liquor or drugs and that, upon request, the person refused to submit to a chemical test . . . , shall revoke the person's New Mexico driver's

license . . . for a period of one year or until all conditions for license reinstatement are met, whichever is later."). However, under New Mexico law, a DUI is also "aggravated" (*i.e.*, subject to additional penalties) when the driver refuses to submit to a chemical test. NMSA 1978, § 66-8-102(D)(3); *see* § 66-8-102(E) –(F).

Given that 1) the Kirtland Implied Consent Advisory references 18 U.S.C. § 3118, 2) the Kirtland Implied Consent Advisory states that "if you refuse to be tested . . . the offense may be characterized as 'aggravated,' [] you may receive a greater sentence because you refused to be tested, and [] your refusal may be admitted as evidence in *any* subsequent civil or criminal proceeding," which seems to reflect the New Mexico statute more than the federal statute, and 3) the parties referenced New Mexico's Implied Consent Act in their arguments at the hearing and relied on *Birchfield* in their arguments, it is unclear which law the AFB officers relied on during Defendant's detention. Moreover, although New Mexico's laws pertaining to driving under the influence apply on federal enclaves through the Assimilated Crimes Act (ACA), 18 U.S.C. §13(a)-(b)(1), it is unclear whether the state Implied Consent Act is assimilated. *See* Judge Brian L. Owsley, *Issues Concerning Charges for Driving While Intoxicated in Texas Federal Courts*, 42 St. Mary's L.J. 411, 421 ("Congress has assimilated state laws criminalizing driving while intoxicated to cover similar offenses on military bases through the Assimilative Crimes Act."); William G. Phelps, *Assimilation, Under [ACA], of State Statutes Relating to Driving While Intoxicated or Under Influence of Alcohol*, 175 A.L.R. Fed. 293 (2002) (collecting cases addressing whether state express/implied consent laws are assimilated). In *United States v. Dillon*, 983 F. Supp. 1037, 1040–41 (D. Kan. 1997),

the court stated that "state statutes which are procedural or regulatory are not assimilated under the ACA" and that the Ninth Circuit in *United States v. Roberts,* 845 F.2d 226, 228–29 (9th Cir.), "held that California's implied consent law provisions were not assimilated under the ACA since they were regulatory and procedural, and did not define a criminal offense and authorize punishment." It went on, "[f]urthermore, there is a federal statute, 18 U.S.C. § 3118, which is an implied consent statute for federal jurisdictions. . . . Thus, even if a state implied consent law could be assimilated, it would be superseded by this statute." The *Dillon* court concluded that 18 U.S.C. § 3118, not the Kansas implied consent act[1], applied at Ft. Riley, Kansas, a federal enclave. *See Love,* 141 F.R.D. at 317 (holding that the express consent provisions of state law were not incorporated under the ACA).

Neither party makes any argument addressing these issues. In any case, however, it is clear that Defendant was *told* that there were criminal penalties associated with refusing a blood test. [Doc. 16-1] Because the focus here is on the effect of that warning on Defendant's consent to the blood draw, not whether he was actually subject to such penalties, the Court need not examine this issue further.

At the hearing, the Government's witness, Staff Sergeant Gomez, a "Drug Recognition Expert (DRE)," [Tr. 4/17/17, 16:12], testified that Defendant was read the "Kirtland Installation Implied Consent Advisory." The Advisory states, "You have

---

[1] Under that statute, a person refusing to submit to a chemical test could be charged with "a separate crime of refusing to submit to a test to determine the presence of alcohol or drugs, which carries criminal penalties that are greater than or equal to the criminal penalties for the crime of driving under the influence." Kan. Stat. Ann. § 8-1001(k)(4) (2015).

consented to chemical test of your breath, blood, and/or urine by driving a vehicle on Base" and that "if you refuse to be tested . . . the offense may be characterized as 'aggravated,' [] you may receive a greater sentence because you refused to be tested, and [] your refusal may be admitted as evidence in *any* subsequent civil or criminal proceeding." [Doc. 16-1; Tr. 4/17/17, pg. 24:12-25:10; 23:4-7] He also testified that the Implied Consent Advisory was read to Defendant by another officer before Sergeant Gomez requested a blood sample. [Tr. 4/17/17, pg. 23:4-7; 41:13-19; 33:22-25] Finally, he testified that Defendant answered "yes" when Sergeant Gomez asked if Defendant would consent to a blood test. [Tr. 4.17.17, pg. 27:16-19]

In accordance with *Birchfield*, the Court will disregard Defendant's "consent" given in response to the Implied Consent Advisory and determine whether, under the totality of the circumstances, Defendant evinced his consent to the blood draw in other ways. *See State v. Phillips*, No. A16-0129, 2016 WL 4497355, at *3 (Minn. Ct. App. Aug. 29, 2016) (unpublished), *review granted in part* (Nov. 15, 2016) (relying on *Birchfield* to reverse and remand to the district court "to reassess the voluntariness of [the defendant's] consent to the blood test in light of all the relevant circumstances, including the partial inaccuracy of the [implied consent] advisory, and to consider the applicability, if any, of the good-faith exception to the exclusionary rule").

**Consent under the Totality of the Circumstances**

To establish voluntary consent, "(1) there must be clear and positive testimony that consent was unequivoc[al] and specific and freely and intelligently given; (2) the Government must prove consent was given without duress or coercion, express or

implied; and (3) the courts indulge every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived." *United States v. Lopez*, 777 F.2d 543, 548 (10th Cir. 1985) (alterations, internal quotation marks and citation omitted). "Consent to search need not be given verbally, but may be demonstrated by actions." *United States v. Saavedra*, 961 F.2d 221 (10th Cir. 1992) (unpublished); *see United States v. Payan*, 905 F.2d 1376, 1379 (10th Cir. 1990) (consent given where the officer "asked [the defendant], 'would you mind opening the trunk,' and [the defendant] had done so without hesitancy or comment").

Courts have considered the following factors in assessing the voluntariness of consent to search:

> (1) the consenting individual's knowledge of the constitutional right to refuse consent;
>
> (2) the consenting individual's age, intelligence, education, and language ability;
>
> (3) the degree to which the consenting individual cooperates with the police;
>
> (4) the consenting individual's attitude about the likelihood of the discovery of contraband; and
>
> (5) the length of detention and the nature of questioning, including police threat of physical punishment or other coercive behavior.

*Warrantless Searches and Seizures*, 42 Geo. L.J. Ann. Rev. Crim. Proc. 46, 97–105 (2013). [Doc. 16, pg. 13] No one factor is dispositive; rather, the Court must assess the totality of the circumstances. *United States v. Gay*, 774 F.2d 368, 376 (10th Cir. 1985) ("Whether a consent was voluntary or was the product of coercion or duress, express or

implied, is to be determined by the totality of the circumstances."). Intoxication does not preclude voluntary consent to search. *See id.* at 376–77 (valid consent where defendant was intoxicated).

Defendant maintains that all of these factors weigh in his favor. [Doc. 16, pg. 13-14] As evidence on the first factor, he points to his notations on the statement and argues that they indicate that he did not understand his right to an attorney. [Doc. 16, pg. 14] The Government disagrees that those notations indicate that Defendant did not understand his rights. [Doc. 19, pg. 3] The Government also argues that Defendant had prior experience with DWI investigations and "had been through this routine before." [Doc. 19, pg. 4] *See United States v. Watters*, 572 F.3d 479, 483–84 (8th Cir. 2009) (relying on the district court's finding that "Watters was a man of mature years, whose criminal history would have familiarized him with the procedural safeguards available to him under the law," among other things, to hold that consent to a vehicle search was valid).

The Court finds that Defendant's consent to the blood draw was not freely and intelligently given. At the hearing, Sergeant Gomez testified that Defendant was reported by the other AFB officers to be in an "altered mental state," [Tr. 4/17/17, 37:2-3] that Defendant made statements about bugs coming out of his skin [Tr. 4/17/17, 37:22-25], that cars with Texas license plates were following him [Tr. 4/17/17, 36:19-22], and that Defendant was "experiencing potential visual hallucinations." [Tr. 4/17/17, pg. 54:6-7] He read aloud Defendant's written statement, in which Defendant stated that he "had something inside me like people," that he "was drugged because my fart now smells like

blood and feels like I am bleeding," and that "[his] family is stuck inside [him] they are the . . . right now trapped. They could get out but [he] need[s] to take them to their bodies. If [he] let them out they will die. It seems they are home but it's not them." [Tr. 4/17/17, pg. 65:16 – 66:5] Furthermore, although Sergeant Gomez testified that Defendant's visions were consistent with use of hallucinogens, no hallucinogens were found in Defendant's blood. [Tr. 4/17/17, pg. 55:13-15 (stating that "a hallucinogen was a potential contributing factor [to Defendant's delusions], along with CNS stimulants")]

Although Sergeant Gomez testified that Defendant was cooperative throughout the drug recognition evaluation, and answered affirmatively to Sergeant Gomez's request for a blood sample, the Court concludes that Defendant's behavior is inconsistent with knowing and intelligent consent. Considering Defendant's behavior in conjunction with the presumption against waiver of an important Constitutional right and the fact that any verbal consent was given only after a threat of criminal sanction, the Court further concludes that the totality of the circumstances indicates that Defendant did not give valid consent for a blood draw.

**Exigent Circumstances**

The Government also argues in its *Response* that exigent circumstances justified the blood draw, although it acknowledged at the hearing that evidence of exigency was scant. [Doc. 19, pg. 5; Tr. 4/17/17, pg. 78:14-15 (Government stating, "admittedly, it's not the best case of exigent circumstances")] The "exigent circumstances" exception to the warrant requirement "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under

the Fourth Amendment." *McNeely*, 133 S. Ct. at 1558 (internal quotation marks and citation omitted). In addition, "in some circumstances law enforcement officers may conduct a search without a warrant to prevent the imminent destruction of evidence." *Id.* at 1559. To determine whether an exigency justified a search, the Court looks to the totality of the circumstances and assesses the facts on a case-by-case basis. *Id.* In *McNeely*, the Court declined to adopt a per se rule allowing blood tests in drunk driving investigations, stating that "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at 1561. It went on to reinforce that the exigency inquiry is a fact-intensive, case-specific inquiry. *Id*. at 1561-68. Consistent with this approach, it observed that "some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test." *Id*. at 1561. Although the *McNeely* Court did not assess the facts behind exigency in that case because the record was undeveloped, it identified several factors that inform the exigency analysis: "[i]n addition to the body's metabolization, they include the procedures in place for obtaining a warrant, the availability of a magistrate judge, and the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence." *Cole v. State*, 490 S.W.3d 918, 924 (Tex. Crim. App. 2016) (internal quotation marks and citation omitted) citing *McNeely*, 133 S. Ct. at 1568.

As an example, in *State v. Buchholz*, 598 N.W.2d 899, 903–04 (S.D. 1999), the South Dakota Supreme Court examined whether a urine test was justified by exigency where the officers suspected the defendant of consuming methamphetamine. The Court examined the following facts: 1) An expert testified that methamphetamine use would be detectable for only two to three days; 2) the traffic stop of the defendant took place on a rural highway; 3) the defendant showed no signs of drug consumption; 4) the defendant declined to give consent to a urine test. *Id*. at 903. The Court held that exigent circumstances existed because, although the methamphetamine might be detectable for three days, "a prompt test will indicate a higher concentration of the drug [which] assists law enforcement in determining whether consumption of the drug was on the day of the stop or recent." *Id*. It went on,

> It is illogical to require that the officer, who is sitting on a rural highway must somehow locate the Beadle County State's Attorney to draft an affidavit, find a Magistrate or Circuit Judge to issue the search warrant, and take the defendant to a medical facility to obtain a urine sample if one is not voluntarily provided, all of which is to be completed while the 24–hour clock is ticking towards expiration of a testing period that may have already expired.

*Id.* Notably, the Court observed that a urine test "is a less intrusive search than the withdrawal of blood from the human body." *Id*.

Here, the Government argues that the dissipation of the methamphetamine in Defendant's body combined with the time it would take to get a warrant created exigent circumstances. [Doc. 19, pg. 5] At the hearing, however, the Government's witness testified that he did not know how long it would have taken to obtain a warrant. [Tr. 4/17/17, 64:2-4; 67:24-68:1] He testified that while he knew of the contact person at the

United States Attorney's office and that he would have to fill out a form, he had never requested such a warrant before. [Tr. 4/17/17, pg. 67:11-12; 63:23-25] Sergeant Gomez did not state any impediments to obtaining a warrant beyond not having done so before. [*See* Tr. 4/17/17, pg. 63:8-12 (stating, "in my understanding of the process, we would have to submit a form to the judge; the judge would have to sign off on it. And it would take time in order for us to fill that out and present it to the judge")] Sergeant Gomez testified that "visual signs" of methamphetamine use are present up to twelve hours, but that he did not know how long methamphetamine remains in the bloodstream. [Tr. 4/17/17, pg. 68:21 to 69:6] He also testified that he was not aware of the "effect metabolization has on the probative value of a blood test." [Tr. 4/17/17, pg. 69:7-9] Finally, Sergeant Gomez testified that he could not estimate, based on the "concentration of methamphetamine in [Defendant's] blood . . . whether or not that corresponds to him being safe to drive, very intoxicated, not very intoxicated, etc." [Tr. 4/17/17, pg. 46:12-18] He added, "Most toxicologists won't, either." [*Id*.] No other evidence as to metabolization of CNS stimulants, hallucinogens, or cannabis was presented.

Given the testimony that methamphetamine remains in the bloodstream more than twelve hours and the lack of evidence that a warrant would have been difficult to obtain in a timely manner, the Court finds that, under the totality of the circumstances, no exigency existed here to justify a warrantless blood draw. *See Cole*, 490 S.W.3d at 924 (discussing the factors for assessing exigency in the context of blood tests).

**The Government's Remaining Arguments**

To the extent the Government argues that suppression under the circumstances here would be overly burdensome on law enforcement, this position is foreclosed by *Birchfield*. *Birchfield* is very clear that a warrant is required for blood draws unless a recognized exception to the warrant requirement is present. *See, e.g.*, *Birchfield*, 136 S. Ct. at 2184 (stating that "the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving" but that there is "no satisfactory justification for demanding [a blood test] without a warrant"); 2185 (stating that even when a suspect is unconscious and unable to take a breath test, officers can apply for a warrant). Indeed, the entire posture of *Birchfield* is premised on the necessity of a warrant for both breath and blood tests except when an exception applies, and the bulk of the opinion is focused on whether both breath and blood tests fall within the "search incident to arrest" exception. *Id*. at 2174-2186.

Finally, to the extent the Government invokes the good faith exception to the "exclusionary rule," [Doc. 19, pg. 2] the exception does not apply here. The "exclusionary rule" "excludes evidence obtained in violation of the Fourth Amendment from being used at trial." *United States v. McCane*, 573 F.3d 1037, 1042 (10th Cir. 2009). The good faith exception applies to prevent suppression of evidence where the officers in question had a good faith belief that their conduct was legal at the time. *Id.* ("In *Leon,* the Supreme Court established the good-faith exception to the exclusionary rule, declining to apply the exclusionary rule when police reasonably and in good faith relied upon a warrant subsequently declared invalid." citing *United States v. Leon*, 468

U.S. 897, 922 (1984)). Because the point of the exclusionary rule is to govern police conduct by excluding evidence obtained illegally, it should apply only when suppression will have a deterrent effect. There is no reason to exclude evidence where the exclusion would have no impact on officers' behavior. *McCane*, 573 F.3d at 1044–45 (stating that "the exclusionary rule should not be applied to objectively reasonable law enforcement activity." (internal quotation marks and citation omitted)).

The United States Supreme Court extended "the good-faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes." *Davis v. United States*, 564 U.S. 229, 239 (2011). In addition, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at 241. In both of these instances, the officers acted in reliance on law that was *later* invalided, either by statute or decision. Here, however, the premise on which the officers obtained consent—that refusal could carry criminal penalty—had *already been* invalidated. *Birchfield* was issued in April, 2016. The incident here occurred in February, 2017. [Doc. 16, pg. 2] Thus, roughly ten months passed between issuance of *Birchfield* and Defendant's arrest. "[E]vidence should be suppressed . . . if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *McCane*, 573 F.3d at 1044. Here, the AFB officers should have known that consent for a blood draw could not be obtained through the threat of criminal sanction. *See Davis*, 564 U.S. at 241 ("Responsible law-enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to

these rules." (internal quotation marks and citation omitted)); *United States v. Herrera*, 444 F.3d 1238, 1246 (10th Cir. 2006) ("While an officer may make an objectively reasonable factual mistake, a failure to understand the law by the very person charged with enforcing it is *not* objectively reasonable." (internal quotation marks and citation omitted)).

The good faith exception would not apply even if the officers here were relying on a form created by their superiors. The fact that the Implied Consent Advisory form was being used to procure warrantless blood draws by Kirtland AFB officers indicates "recurring or systemic negligence" on the part of the department. *Davis*, 564 U.S. at 240 (internal quotation marks and citation omitted); *see State v. Havatone*, 389 P.3d 1251, 1256 (Ariz. 2017) ("When the Fourth Amendment violation occurred not as the result of an officer's fact-specific determination that obtaining a warrant is infeasible but pursuant to department practice making such determination unnecessary, we impute to the law enforcement agency the responsibility to assure that unlawful seizures will not occur."). This kind of conduct is the very kind intended to be curbed by exclusion of evidence. *Herring v. United States*, 555 U.S. 135, 144 (2009) ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.").

### III. CONCLUSION

For the reasons stated herein, *Defendant's Opposed Motion to Suppress All Evidence Arising from Blood Drawn Pursuant to 'Consent' Coerced by Threat of Criminal Sanctions* [Doc. 16] is **GRANTED**.

**SO ORDERED this 24th day of April, 2017.**

                                                    M. CHRISTINA ARMIJO
                                                    Chief United States District Court Judge